# United States Court of Appeals
## For the First Circuit

Nos. 06-1373, 06-1374, 06-1488

UNITED STATES OF AMERICA,

Appellant, Cross-Appellee,

v.

DANIEL E. CARPENTER,

Defendant-Appellee, Cross-Appellant.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Circuit Judge,
Campbell, Senior Circuit Judge,
and Lipez, Circuit Judge.

Michael J. Pineault, Assistant U.S. Attorney, with whom
Michael J. Sullivan, U.S. Attorney, was on brief, for appellant,
cross-appellee.
Martin G. Weinberg, with whom Robert M. Goldstein was on
brief for appellee, cross-appellant.

July 18, 2007

**LIPEZ, <u>Circuit Judge</u>**.   In an appeal brought by the government, we must decide whether the district court erred when it granted Daniel Carpenter a new trial because the government's use of inflammatory language during its closing and rebuttal arguments prejudiced the jury and denied Carpenter a fair trial.   In a cross-appeal, Carpenter asserts that the district court erred in failing to grant his motion for judgment of acquittal.   We affirm the new trial ruling.   We conclude that we lack jurisdiction to hear Carpenter's cross-appeal.

**I.**

## A.  Factual Background

We briefly rehearse the relevant facts, which are largely undisputed.   In October 1998, Daniel Carpenter and Martin Paley formed Benistar Property Exchange Trust Company, Inc. ("Benistar") for the purpose of performing property exchanges pursuant to section 1031 of the Internal Revenue Code, 26 U.S.C. § 1031. § 1031(a)(1) allows a seller of "property held for productive use in a trade or business or for investment" to avoid capital gains on the sales proceeds if they are used to purchase a replacement property meeting the same criteria.   In order to qualify, the seller must complete the exchange within 180 days of the original sale and must not take control of the proceeds in the interim, § 1031(a)(3). Accordingly, property owners typically entrust their

sales proceeds to a qualified intermediary until they purchase replacement property; Benistar was created to play this role.

Benistar's clients signed standard form agreements providing that property sale proceeds be transmitted by wire or check directly from the closing attorney into a Benistar account. Clients chose between a Merrill Lynch Ready Asset Money Market Account, yielding a 3% return on investment per annum (which allowed clients to access their funds upon 48 hours' notice), and a Merrill Lynch Investment Account, yielding 6% interest (which required 30 days' notice before funds could be accessed).

According to the agreement between Paley and Carpenter, Paley marketed Benistar's services to clients while Carpenter maintained sole authority over the financial aspects of the business. Carpenter opened two accounts at Merrill Lynch in October 1998: the "B01 account," into which client funds were deposited; and the "B10 account," into which Carpenter transferred client funds which he then invested. When he opened the B10 account, Carpenter characterized his risk tolerance as "aggressive" and he informed Merrill Lynch that he intended to engage in options trading. As is their practice, Merrill Lynch counseled Carpenter on the riskiness of these investments and required him to sign a form acknowledging his understanding of those risks.

From October 1998 until late September 2000, Carpenter transferred funds from the B01 account to the B10 account and

traded extensively in stock options.  While his trading strategy was successful at first,[1] Carpenter lost significant sums when the stock market began to decline in March 2000.  As the market continued to decline thereafter, his Merrill Lynch brokers repeatedly counseled Carpenter to adopt a more conservative trading strategy.  After Carpenter sustained roughly $4 million in losses, Merrill Lynch suspended his trading privileges.

Carpenter then moved his trading activity to PaineWebber, where he again opened linked accounts: client funds were deposited by mail or wire into one account and he engaged in stock option trading from the other account.  As had Merrill Lynch, PaineWebber counseled Carpenter on the risks inherent in options trading; Carpenter acknowledged these risks and continued his aggressive investment strategy.  Carpenter continued to sustain heavy trading losses at PaineWebber and, despite his broker's urging that he adopt a more conservative investment strategy, Carpenter increased the size and riskiness of his trades as his fortunes declined. PaineWebber discontinued Carpenter's trading privileges in December 2000.  Although Benistar had been losing client funds since March 2000, incoming funds had covered the losses.  However, by January 2001, Benistar was forced to tell its clients that their money was

---

[1] Indeed, testimony indicated that, in the fourth quarter of 1999, Carpenter was "up" roughly $800,000.00, providing Carpenter with slightly more than $600,000.00 in profit.

gone.  Benistar subsequently ceased operations, having lost roughly

$9 million in client funds.

## B.  Carpenter's Trial

Carpenter was indicted in February 2004 by a federal

grand jury in the District of Massachusetts on fourteen counts of

wire fraud, in violation of 18 U.S.C. § 1343, and five counts of

mail fraud, in violation of 18 U.S.C. § 1341.  In particular,

Carpenter was charged with having devised and implemented a scheme

to defraud investors by representing that their money would be

invested prudently in conformity with the property exchange

requirements of the Internal Revenue Code while he intended to

pursue an investment strategy at odds with such representations.

Critically, clients transferred funds to Carpenter and Benistar by

mail and wire in response to the investment scheme.  Because both

mail and wire fraud require an intent to defraud, the trial focused

largely on Carpenter's state of mind when he obtained the funds of

Benistar's clients through the representations made to them.

In his defense, Carpenter portrayed his lack of

interaction with clients and his lack of knowledge about Benistar's

promotional materials.  He contended that any assurances made to

clients about the risks to their funds were made by Paley alone and

without his knowledge.[2]  In addition, Carpenter emphasized that the

---

[2] Paley provided extensive documentary evidence and deposition
testimony to the government as it built its case.  He also
testified as a witness against Carpenter at trial.  No criminal

client agreements placed no restrictions on how funds would be managed in order to produce the 3% or 6% return selected by the clients. Carpenter argued that he never misled clients into believing their funds would be safe. Rather, he insisted that he acted with the good faith belief that he had unfettered discretion to invest client funds. He attributed Benistar's losses not to an unwise trading strategy but to a generalized stock market crash well beyond his control.

The government focused on the incongruity between the nature of a § 1031 property exchange (a transaction structured to avoid capital gains while allowing investors to use the proceeds of one property sale to purchase a replacement property within a short period of time) and the aggressive nature of Carpenter's investment behavior. It contended that this incongruity demonstrated Carpenter's intent to mislead Benistar's clients into depositing their real estate proceeds with a supposedly safe intermediary so that he could leverage the funds into a substantial profit for himself through risky options trading. To prove this agenda, the prosecution sought to introduce extensive evidence regarding Carpenter's investment behavior, relying chiefly on testimony from his brokers at Merrill Lynch and PaineWebber.

charges were brought against Paley in connection with this wire and mail fraud scheme.

Carpenter's counsel objected to such evidence before its introduction and throughout the trial, arguing that testimony regarding Carpenter's trading strategy and losses was both irrelevant to establishing his state of mind at the time he obtained client funds and also highly prejudicial. The court denied counsel's motions in limine and his repeated objections, ruling that the brokers could testify as to factual matters for the limited purpose of allowing the jury to "consider[] the historical fact of the kind of trading that was done so the jury can decide . . . whether [Carpenter] had the requisite criminal state of mind" when investors were assured that their funds would be kept safe. The court also determined that, because no foundation had been laid to treat them as experts, these witnesses could not provide opinion testimony. In addition, the court repeatedly expressed its concern that such evidence not be used to distract the jurors from the elements of the charged offenses of mail and wire fraud. These witnesses's testimony dominated three of the ten days of Carpenter's trial.

During its closing and rebuttal arguments,[3] the government emphasized that the riskiness of Carpenter's trading strategy conflicted with the purposes for which Benistar's clients entrusted their money to Carpenter's management. In making this

_____

[3] The closing and rebuttal arguments will be referred to hereinafter as "the closing arguments."

-7-

argument, the government embellished its description of Carpenter's trading strategy with gambling metaphors and terminology intended to show Carpenter's recklessness.

A jury convicted Carpenter on all counts. Shortly thereafter, Carpenter filed motions for a new trial under the Federal Rules of Criminal Procedure 33(b)(2) and for judgment of acquittal under Rule 29(c), each raising several grounds. The district court granted the motion for a new trial, ruling that the government's repeated use of gambling metaphors during its closing arguments "may [] have induced a verdict based on the jury's moral disapproval of the 'gambling'" rather than on the jury's conclusion that Carpenter had committed mail and wire fraud. United States v. Carpenter, 405 F. Supp. 2d 85, 102 (D. Mass. 2005). The court denied the motion for acquittal and subsequently denied Carpenter's motion for reconsideration. The government appealed the new trial ruling pursuant to 18 U.S.C. § 3731[4] and Carpenter filed a cross-appeal, arguing that the court wrongly decided his motion for acquittal.

---

[4] We note that the government's ability to appeal the district court's grant of a motion for a new trial is a relatively recent phenomenon, arising from the 1984 amendments to § 3731.

## II.

### A.  The Motion for a New Trial

The government contends that the district court abused its discretion in granting the motion for a new trial because: (1) it did not apply plain error review despite Carpenter's failure to object to the government's use of gambling metaphors until after the jury delivered its verdict; (2) the government's references to gambling were not improper under any standard; and (3) even if the gambling references were improper, they did not amount to a "miscarriage of justice," warranting a new trial.  England v. Reinauer Transp. Cos., 194 F.3d 265, 270 (1st Cir. 1999) (citing Conway v. Electro Switch Corp., 825 F.2d 593, 598-99 (1st Cir. 1987)).  We consider these arguments in turn.

#### 1.  Preservation of Carpenter's Objection

The government argues that because Carpenter did not contemporaneously object to the government's use of gambling metaphors during its closing arguments, the district court should have reviewed the motion for a new trial based on those arguments for plain error.[5]  Although the government pressed this same plain error argument before the district court, the court did not expressly address the argument in its opinion ordering a new trial.  Nevertheless, as we shall explain, the court's opinion can only be

---

[5] The parties agree that the court did not apply plain error review.

read as an implicit determination that Carpenter preserved his objection to the closing arguments.

The government concedes that Carpenter moved in limine and made several trial objections to the introduction of testimony related to Carpenter's investment strategy and losses. However, the government argues that these objections were insufficiently specific, and that they addressed only the admission of evidence and not the manner in which the government could argue from that evidence during its closing and rebuttal.

Historically, when a party's motion in limine to exclude evidence had been denied, the party's failure to renew the objection at trial was considered "fatal." E.g., United States v. Vest, 842 F.2d 1319, 1325 (1st Cir. 1988). However, Federal Rule of Evidence 103(a) was amended in 2000 to read, in pertinent part: "[o]nce the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." The accompanying commentary explains that "[w]hen the ruling is definitive, a renewed objection or offer of proof at the time the evidence is to be offered is more a formalism than a necessity." Fed. R. Evid. 103 advisory committee's note, 2000 Amendment. In applying this rule, we must pay particular attention to the question whether the trial court made "definitive" rulings

on the motion in limine.  Crowe v. Bolduc, 334 F.3d 124, 133-34 (1st Cir. 2003).

Carpenter repeatedly objected to the introduction of evidence regarding his trading strategy and losses, arguing that it was irrelevant and overly prejudicial because it distracted the jury's attention from whether he intended to defraud Benistar's clients at the time their funds were solicited, and focused their attention instead on the sagacity of his investment strategy. Indeed, before the trial even began, Carpenter moved in limine to preclude the testimony of the Merrill Lynch and PaineWebber brokers based on irrelevance and undue prejudice.  He also argued that, because they had not been identified as expert witnesses, the brokers should not be allowed to give any evaluative opinions about his trading strategy.

The court found Carpenter's arguments somewhat persuasive, ruling on the motion in limine that the "jury may take account of what kind of trading was done in evaluating whether there was a culpable state of mind. . . . but evaluative opinions about the nature of the trading from people who have not been identified as [expert] witnesses will not be permitted."  In addition, the court stated that "it would be appropriate to caution the jury in [its] instructions to stay on the elements of the offenses that are charged and not imagine other wrongs."  The court

added: "[w]hen we've seen all the evidence, we'll have a clearer idea of what to do on that subject."

Despite the court's preliminary ruling on his objection to the brokers' testimony, Carpenter continued to object to that testimony to assure the preservation of his objection. For instance, at the end of the first day of broker testimony, Carpenter's counsel stated: "I just want to preserve my objection because I don't know if I preserved [it] adequately in terms of all the testimony that came in . . . . [I]t's the same issue, but I didn't want to stand up every time." The court responded: "I think your objection is preserved."

At the conclusion of the Merrill Lynch brokers' testimony, Carpenter filed a motion for mistrial, arguing that he had been "irretrievably prejudiced in front of the jury by the [testimony of the] Merrill Lynch witnesses that he was an aggressive speculator[,] river boat gambler." The court denied Carpenter's motion for a mistrial, explaining: "I adhere to the ruling that permitted the admission of the evidence in advance. I understand the point. We'll deal with it at some additional occasions." When Carpenter's counsel asked for a "running objection in line with the motion [for a mistrial]. . . . So I don't have to stand up," the court responded: "You're covered under Rule 103." The recognition of a continuing objection could not be clearer.

After Carpenter received that assurance, the government presented two expert witnesses who testified regarding Carpenter's investment strategy. In a motion in limine seeking to preclude the testimony of the second expert, Marc Allaire, Carpenter argued: "the jury has already heard sufficient evidence regarding the rudiments of options investments . . . . Any further testimony by Allaire on this issue would simply be cumulative, unhelpful and a waste of time." Although the court rejected the motion in a ruling from the bench, it reiterated its concern for

> making sure that the jury at the appropriate time is focused on the elements of the offense and what needs to be proved. And I agree that to some degree this is all relevant as to state of mind, but I'm concerned that the more the wisdom of the trading strategy gets debated, the more the jury will think that has greater significance than maybe it does in their deliberations. . . . I want to keep this focused on whether there was an intent to deceive or specific intent to defraud.

Carpenter's counsel persisted, stating: "I'm not going to belabor the point, your Honor . . . . I would just preserve the issue." The court responded: "Okay. All right." After Allaire's testimony, the court heard a final day of testimony focused primarily on establishing the authenticity of the actual mail and wire transfers of funds from Benistar's clients into the Benistar account. The parties then presented their closing arguments the next day.

Thus, the trial court devoted considerable attention to the contested evidence throughout the trial, fielding repeated objections and stressing its concern that the government limit its use of the evidence to illuminating Carpenter's intent. Placed in this context, we find unpersuasive the government's attempt to distinguish between the introduction of the evidence covered by Carpenter's objections at trial and the prosecution's arguments from that evidence, to which Carpenter did not specifically object before jury deliberations. We look in vain for any indication that the government drew this distinction in its written submission to the district court in opposition to Carpenter's motion for a new trial. More importantly, even if this distinction was discernible in the government's opposition, the district court was entitled to reject it and conclude that Carpenter's continuing objections to the admission of evidence about his investment strategy and losses applied as well to the government's closing arguments based upon that evidence.[6] Hence we reject the government's argument that the

---

[6] The dissent argues that we should not infer that the court ruled that defendant preserved his objection to the government's use of gambling metaphors in its closing arguments and that the plain error standard did not apply to the request for a new trial based on the closing arguments. However, the government explicitly argued for plain error review in its written opposition to Carpenter's motions for judgment of acquittal and a new trial. The court issued a lengthy published decision on these motions, addressing each of Carpenter's arguments in detail, including the argument that the court entitled in its decision "Prejudicial Inflammatory Argument" (a reference to the gambling metaphors). In explaining its decision to grant a new trial because of this inflammatory argument, the court explained its decision in harmless

district court erred in failing to apply plain error review to the government's new trial motion.

The dissent disagrees with this conclusion, asserting that the district court had to apply the plain error standard to the defendant's motion for a new trial because Carpenter failed to preserve his objection to the government's use of gambling metaphors in its closing arguments. This assertion reflects the dissent's unstated premise that appellate review of the trial court's preservation determination is de novo. That is not the law. Instead, the appellate court should defer to such a preservation ruling by the district court. The preservation

error terms: "Because it cannot be said with confidence that the government's improper closing arguments did not taint the verdict, the verdict cannot be allowed to stand." This language echoes other decisions on new trial motions that have evaluated whether the interest of justice requires a new trial under the harmless error standard. See, e.g., United States v. Casas, 425 F.3d 23, 38 (1st Cir. 2005) (assessing whether trial error affected the trial's outcome); United States v. Hodge-Balwing, 952 F.2d 607, 610 (1st Cir. 1991) (same); United States v. Capone, 683 F.2d 582, 585-86 (1st Cir. 1982) (same). Given the thoroughness of the court's decision, including its explanation of the reasons for granting a new trial, we can only conclude that the court did not apply plain error review because it consciously rejected the government's plain error argument. Moreover, even if the district court had satisfied the dissent's insistence on an explicit ruling rejecting the plain error standard, the dissent would still deem that ruling a legal error. The dissent's central concern is not the adequacy of the court's explanation of its decision to apply the harmless error standard. Instead, the dissent argues that the district court could not apply the harmless error standard because, as a matter of law, the defendant did not preserve his objection to the government's use of gambling metaphors in its closing arguments. As we explain more fully, that argument misperceives the standard of review that an appellate court should apply to a trial court's preservation ruling.

requirement has two components: alerting a trial judge to a party's objection to a ruling or to the admission of evidence and adequately explaining the basis for that objection. See Estate of Keatinge v. Biddle, 316 F.3d 7, 15 (1st Cir. 2002). Thus advised, the trial judge can decide what course of action to take to assure, so far as possible, the legal correctness of the trial proceedings. Id. Faced with post-trial arguments debating whether an objection to evidence or arguments was adequately preserved, it is certainly the trial judge who is in the best position to decide if she sufficiently understood that an objection had been made and the grounds for it. Given that reality, the appellate court should defer to the trial court's preservation ruling.[7] The dissent rejects such deference in favor of a de novo standard of review which fails to account for the trial court's superior position to determine whether it has been properly apprised of an objection.

---

[7] We routinely defer to the trial court when it is better positioned to assess the relevant factors for making particular kinds of decisions. See, e.g., Castro v. Chicago Hous. Auth., 360 F.3d 721, 735 (7th Cir. 2004) (deferring to trial court's evaluation of party's motion practice); United States v. Capelton, 350 F.3d 231, 238 (1st Cir. 2003) (applying abuse of discretion standard to trial court's ruling on a motion for mistrial); Ferrara & Dimercurio v. St. Paul Mercury, 240 F.3d 1, 13 (1st Cir. 2001) (deferring to trial court's determination whether misconduct occurred and whether it required judicial sanction); United States v. Dumas, 207 F.3d 11, 16 (1st Cir. 2000) (deferring to trial court's assessment of witness credibility); United States v. Gonzales-Maldonado, 115 F.3d 9, 20 (1st Cir. 1997) (deferring to trial court's determination of evidence's relevance).

In addition, contrary to the suggestion of the dissent, there is no rule that preserved objections to the admission of evidence cannot also cover closing arguments based upon that testimony. Here, in evaluating defendant's demand for a new trial on the basis of gambling metaphors in the government's closing arguments, the district court could reasonably conclude that the defendant's strenuous objections to the evidence on trading strategy and losses embraced the gambling metaphors that characterized that evidence in such provocative terms in the government's closing arguments.

The dissent cites unfairness to the government in the district court's new trial ruling. Specifically, the dissent speculates that "had there been a cognizable objection here, the government would likely not have to retry the case, and the considerable burdens of a retrial would not be placed upon witnesses and alleged victims." Once again the dissent refuses to acknowledge the superior position of the district court to determine, from its vantage, that the defendant had already registered a cognizable objection to the government's use of gambling metaphors through its repeated objections to the evidence underlying those metaphors.

However, there was always the risk for the government that the court, in the context of a post-trial motion for a new trial, would reconsider the appropriateness of its handling of the

-17-

evidence and arguments on trading strategy and financial losses. That risk emphasizes why there is no unfairness to the government in the court's decision to award a new trial. As we have already noted, after one of its rulings admitting evidence on trading strategy and losses, the court stated that "it would be appropriate to caution the jury in [its] instructions to stay on the elements of the offenses that are charged and not imagine other wrongs." The court expressed similar concerns on other occasions about the potential for the unfairly prejudicial impact of this evidence on the jury. Yet, as we explain more fully in the next section of the opinion, the government ignored the court's concerns about the limited relevance of the trading strategy and financial losses evidence. Instead of engaging in a straightforward explanation of the relevance of that evidence to the defendant's criminal intent, the government used provocative gambling metaphors to characterize that evidence. This calculated decision by the government increased the risk that the court, in evaluating a post-trial motion for a new trial, would conclude that this provocative treatment of the potentially unfairly prejudicial evidence made this prejudice real and required a new trial in the interest of justice.

The government cannot claim surprise in such a ruling. When it resorted to the gambling metaphors in its closing arguments, the government made its own gamble that the court,

despite its uneasiness about the potential prejudicial impact of the evidence of trading strategy and financial losses on the jury, would not conclude, in evaluating the inevitable motion for a new trial, that the government had gone too far with its arguments. There is no unfairness to the government if it has now lost that gamble.

 2. Propriety of Gambling Metaphors in Closing

 We must now decide if the district court was correct in ruling that the government had gone too far with the many gambling references during its closing arguments. Although we employ the deferential abuse of discretion standard in reviewing the district court's ultimate determination that the prosecution's inflammatory statements warrant a new trial, we must review de novo the prior question of whether the comments themselves were improper. United States v. Hernandez, 218 F.3d 58, 68 (1st Cir. 2000) (reviewing de novo whether prosecutor's statements during closing arguments were improper because they relied on evidence related to activities outside the scope of the alleged conspiracy to prove a criminal association); United States v. Lewis, 40 F.3d 1325, 1337-38 (1st Cir. 1994) (applying de novo review to determine the propriety of prosecutor's comments during closing arguments that the defense had failed to produce evidence regarding an alleged "frame up"); United States v. Glantz, 810 F.2d 316, 320-21 & n.2 (1st Cir. 1987) (acknowledging that a de novo standard of review applies to the

-19-

legal question of whether the prosecutor's arguments were proper, but determining that the court need not decide propriety where it finds that the grant of a new trial on the basis of such arguments was an abuse of discretion even if the arguments were improper).

The district court acknowledged that the "gambling characterizations were not, as a matter of the narrative of the government's case, wholly inapt," 405 F. Supp. 2d at 101. However, it found that the "repeated references to gambling were intended to, and did, inflame the jury's passions against the defendant," id. We agree.

In assessing whether the use of particular language is improper, we look beyond the technical accuracy of a phrase and consider such factors as the "threat of unfair prejudice, frequency of use, and alternative means of description." United States v. Felton, 417 F.3d 97, 103 (1st Cir. 2005). The prosecution's use of gambling language was extensive. The district court counted eighteen instances in which the government used some permutation of the word "gamble," along with numerous references to other gambling terms. 405 F. Supp. 2d at 101. The government referred to gambling in its morally freighted gaming sense, with provocative references to "cashing in chips," "doubling down" and "river boat gambler." In a particularly dramatic example, the prosecution intoned:

> Any reasonable person with or without
> investment experience and knowledge would have

> said it's time to cash in my chips and go home. Not Dan Carpenter. He kept on playing. . . . The self-professed river boat gambler pushes on until the losses mount and mount and mount.

Finally, we are most concerned that the government would use such provocative language in the face of the court's repeated caution that the evidence upon which the gambling terminology was based should not be used to distract the jury from its focus on Carpenter's state of mind when he obtained his clients' funds. We cannot ignore this important context in evaluating the choices the prosecution made when it crafted its closing arguments.

While we agree that "a criminal defendant is not entitled 'to a prosecutorial summing-up confined to platitudes and euphemisms,'" United States v. Rodriguez-Estrada, 877 F.2d 153, 159 (1st Cir. 1989) (quoting Palmariello v. Sup't of MCI Norfolk, 873 F.2d 491, 494 (1st Cir. 1989)), we must also ensure that "while a prosecutor 'may strike hard blows, he is not at liberty to strike foul ones,'" United States v. Taylor, 54 F.3d 967, 977 (1st Cir. 1995) (quoting Berger v. United States, 295 U.S. 78, 88 (1935)). Because the government repeatedly referred to gambling in a pejorative sense in its closing arguments, despite the district court's explicit warning against distracting the jurors from the elements of the crimes charged, we agree with the district court that the prosecutor's gambling arguments were improper.

3. Grant of a New Trial

Before granting a new trial based on a prosecutor's improper comments in a closing argument, a court must "determin[e] 'whether [those comments] ha[ve] so poisoned the well that a new trial is required,'" United States v. Robinson, 473 F.3d 387, 398 (1st Cir. 2007). In so doing, the court considers such factors as: (1) the extent of the improper remarks, (2) the context, (3) the likely effect of any curative instructions given by the judge, and (4) the weight of the evidence against the defendant. Id. (citing United States v. Casas, 425 F.3d 23, 38 (1st Cir. 2005)). However, these factors are not exhaustive; they are meant merely to guide the court's inquiry into whether the prosecutor's improper comments have undermined the fairness of the trial.

In assessing the extent to which the improper arguments affected the outcome of the trial, the district court focused on the frequency with which the gambling references were made, their "persistently pejorative" nature and their "tendency to lead the jury away from the charges in the indictment by inviting them to blame Carpenter because he was a gambler, or because he lost the exchangors' money, rather than because he had committed mail or wire fraud." 405 F. Supp. 2d at 102.

The court also emphasized the context in which those comments were made, noting that it had admitted the evidence from which these gambling metaphors were drawn for a "limited purpose,"

-22-

and observing that "this evidence was introduced in the latter stages of the government's case, close in time to the closing arguments.  As the arguments were made, this evidence likely remained vivid in the jurors' memories."  Id.  Placed in this context, the court concluded: "Condemning Carpenter for 'gambling,' as the prosecutors persisted in doing, was an appeal to instincts of moral disapprobation about recklessness, waste, and perhaps even theft."  Id.

After highlighting the improper nature of the government's arguments, the court related those arguments to the overall strength of the government's case:

> though sufficient to withstand a motion for judgment of acquittal, the case was not so strong that it can confidently be said that the repeated 'gambling' references had no illegitimate effect on the jury's assessment of the evidence.  On what was perhaps the crucial issue, the jury would certainly have been warranted in concluding beyond a reasonable doubt that Carpenter acted with intent to defraud, but a contrary conclusion also would have been rationally possible on the evidence.

Id. at 103.  The court concluded: "Because it cannot be said with confidence that the government's improper closing arguments did not taint the verdict, the verdict cannot be allowed to stand."  Id.

We afford the district court substantial deference in such an assessment, reflecting the trial judge's familiarity with the case.  The "trial judge 'has listened to the tone of the argument as it was delivered and has observed the apparent reaction

-23-

of the jurors.  In short, he is far more "conversant with the factors relevant to the determination" than any reviewing court can possibly be.'"  Glantz, 810 F.2d at 320 n.2 (quoting Arizona v. Washington, 434 U.S. 497, 514 (1978)).  We find no basis for concluding that the district court abused its discretion in ordering a new trial.[8]

**B.  The Motion for Judgment of Acquittal**

In his cross-appeal, Carpenter contends that the district court erred in denying his motion for judgment of acquittal because the government failed to present sufficient evidence on the mail and wire fraud charges to permit a reasonable jury to convict him. Before we may reach the merits of Carpenter's cross-appeal, we face the threshold question of our jurisdiction.  Carpenter urges us to assert jurisdiction over his cross-appeal under the so-called "collateral order" doctrine, in order to protect his right to be free from double jeopardy and as a matter of judicial economy.

Although 28 U.S.C. § 1291 specifies that our jurisdiction extends only to appeals from "final decisions of the district courts," the Supreme Court, in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546 (1949), identified a "small class . . . [of] claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too

---

[8] Our agreement with the district court's grant of a new trial because of gambling metaphors obviates any need to address the alternative bases Carpenter asserted in his motion for a new trial.

independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."

The Court has since held that "a pretrial order denying a motion to dismiss an indictment on double jeopardy grounds . . . fall[s] within [this] 'small class of cases.'" Abney v. United States, 431 U.S. 651, 659 (1977). There, the Court relied upon the finality of the district court's action – there being "no further steps that can be taken in the District Court to avoid the trial the defendant maintains is barred by the Fifth Amendment's guarantee," id. – and the fact that the "elements of [his double jeopardy] claim are completely independent of his guilt or innocence," id. at 660. The court also emphasized that "even if the accused is acquitted, or, if convicted, has his conviction ultimately reversed on double jeopardy grounds, he has still been forced to endure a trial that the Double Jeopardy Clause was designed to prohibit." Id. at 662.

Carpenter argues that the refusal to consider his cross-appeal would force him "to endure the personal strain, public embarrassment, and expense of a [second] criminal trial," which Abney sought to avoid. Id. at 661. With this language, Carpenter invokes the principle of double jeopardy. See Green v. United States, 355 U.S. 184, 187-88 (1957) ("[T]he State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting

him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."). In addition, he claims that our refusal to hear a sufficiency claim in these circumstances would burden defendants with a "Hobson's choice" between: (1) waiving the right to move for a new trial in order to ensure appellate review of a sufficiency claim; and (2) moving for a new trial and losing the right to appeal a sufficiency claim arising from the first trial. Carpenter further argues that considerations of judicial economy support our review because we must review the trial record in any event to assess the government's appeal of the new trial ruling.

While Carpenter's assertions have practical appeal, they run afoul of most of the relevant precedent. As we have recognized elsewhere, Abney "is not carte blanche authority for all interlocutory appeals brought under the Double Jeopardy banner, since some such claims do not meet the requirements of the 'collateral order' doctrine." United States v. Ramirez-Burgos, 44 F.3d 17, 18 (1st Cir. 1995). In order to qualify for review under the collateral order doctrine, the collateral issue must:

> (1) [be] so conceptually distinct from other issues being litigated in the underlying action that an immediate appeal would neither disrupt the main action, nor threaten to deprive the appellate court of useful context which might be derived from subsequent developments in the litigation; (2) completely and conclusively resolve the collateral issue;

> (3) infringe rights which appellant could not
> effectively vindicate in an appeal after final
> judgment in the case; <u>and</u> (4) involve an
> important or unsettled legal issue, rather
> than merely challenge discretionary trial
> court rulings.

<u>United States</u> v. <u>Kouri-Perez</u>, 187 F.3d 1, 5 (1st Cir. 1999). We have emphasized that "all four of [these] criteria must be met for there to be jurisdiction under this exception to § 1291 finality." <u>In re Licht & Semonoff</u>, 796 F.2d 564, 571 (1st Cir. 1986).

In <u>Richardson</u> v. <u>United States</u>, 468 U.S. 317, 325 (1984), the Supreme Court reasoned that "the protection of the Double Jeopardy Clause . . . applies only if there has been some event, such as an acquittal, which terminates the original jeopardy." Guided by this principle, the Court went on to determine that a mistrial was not a jeopardy-terminating event and thus a second trial was not barred even if there had been insufficient evidence to convict at the first trial. <u>Id.</u> at 326.

We extended this logic to the vacatur of a conviction on appeal for legal error in <u>United States</u> v. <u>Porter</u>, 807 F.2d 21, 24 n.2 (1st Cir. 1986), stating: "where the first conviction was vacated for legal error, not insufficiency of evidence, the concept of continuing jeopardy rules out a double jeopardy claim based on purported insufficiency of evidence at the first trial." Thus, a defendant who succeeds on appeal in demonstrating that he is entitled to a new trial because of error at his first trial may not

-27-

assert a double jeopardy bar to retrial.  As his original jeopardy has not yet ended, there is no double jeopardy to avoid.

It is a short step from <u>Porter</u> to the case before us, where the trial court itself ordered a new trial on the basis of legal error.  <u>Porter</u> teaches that a defendant has no double jeopardy claim when his conviction has been vacated for legal error.  <u>Id.</u> at 24.  That is what occurred here.  Although Carpenter's conviction was undone by the trial court rather than on appeal, this is a distinction without a difference.

Without a viable double jeopardy claim, Carpenter has no double jeopardy "right" that he cannot effectively vindicate if he is not permitted to challenge the sufficiency of the evidence in this appeal.  Hence he cannot meet the third criterion of the collateral order doctrine.[9]  The Second and Seventh Circuits have

_____

[9] It is important to understand that Carpenter, in pursuing his cross-appeal, has invoked the principle of double jeopardy in the service of his primary argument that we should review the sufficiency of the evidence argument he makes in his cross-appeal. That is, Carpenter did not file a motion in the trial court arguing that his retrial was barred by the principle of double jeopardy. Indeed, there was no basis for any such argument.  Hence, we are not reviewing a double jeopardy ruling by the trial court, or a claim that such a double jeopardy ruling itself falls within the collateral order doctrine.  Instead, Carpenter uses double jeopardy principles to address the third element of the collateral order doctrine – namely, that the failure to address the collateral issue on appeal (here, sufficiency of the evidence) will infringe rights which appellant could not effectively vindicate in an appeal after final judgment in the case.  Carpenter argues that, if the trial judge ruled incorrectly on his motion for judgment of acquittal, and if we failed to assess that possibility by hearing his cross-appeal, his retrial would infringe his double jeopardy right. However, as we have now shown, Carpenter misconstrues the nature of

similarly found no jurisdiction to hear cross-appeals of a denial of a motion for judgment of acquittal under the collateral order doctrine where the district court's order of a new trial vacated the underlying conviction. United States v. Eberhart, 388 F.3d 1043, 1051 (7th Cir. 2004), rev'd on other grounds, 546 U.S. 12 (2005); United States v. Ferguson, 246 F.3d 129, 138 (2d Cir. 2001).

Carpenter claims support for his cross-appeal in three decisions from other circuits: United States v. Greene, 834 F.2d 86 (4th Cir. 1987); United States v. Wood, 958 F.2d 963 (10th Cir. 1992); and United States v. Gotti, 451 F.3d 133 (2d Cir. 2006). Only Greene supports his position, and we decline to follow it.

In Greene, after the trial court ordered a new trial and denied Greene's motion for acquittal, the government appealed the new trial grant. Greene cross-appealed, arguing that the district court erred when it rejected his claim that the evidence was not sufficient to convict him and that to require another trial would violate his right not to be placed in jeopardy twice for the same offense. Greene, 834 F.2d at 87. While acknowledging that the "denial of a motion for judgment of acquittal prior to entry of a judgment or sentence [is] normally not reviewable in the Court of

_____

his double jeopardy right, and hence he cannot meet the third criterion of the collateral order doctrine.

Appeals," the court determined that it "would be unfair to apply such a rule in the present proceedings."  Id. at 89.

Neither Wood nor Gotti reaches such a result.  In Wood, the trial court ordered a new trial and denied Wood's motion for judgment of acquittal.  The government appealed the grant of a new trial, and Wood cross-appealed the denial of his motion for acquittal contending that double jeopardy barred his retrial.  Wood, 958 F.2d at 965.  Wood's double jeopardy claim was also based on the insufficiency of the evidence at his trial.  Id. at 967.  On the government's motion to dismiss the cross-appeal for lack of jurisdiction, the Tenth Circuit denied the motion and asserted jurisdiction over Wood's cross-appeal because it found a "colorable double jeopardy claim" giving rise to jurisdiction under the collateral order doctrine, United States v. Wood, 950 F.2d 638, 643 (10th Cir. 1991).  However, in its subsequent ruling, it affirmed the new trial grant and ultimately ruled that the double jeopardy claim lacked merit for many of the same reasons that we cite here, given that the district court had granted defendant's motion for a new trial, Wood  958 F.2d at 970-71.[10]  Notably, the court further concluded that its "resolution of the merits of Defendant's claims makes future double jeopardy claims like Defendant's non-colorable

_____

[10] For example, the court emphasized that Wood could not be at risk of double jeopardy where his original jeopardy had not yet ended.  958 F.2d 963 at 970 (explaining that "[a] guilty verdict by a jury which is set aside by the district court on a motion by the defendant does not terminate jeopardy.").

-30-

and, therefore, subject to summary dismissal when asserted on an interlocutory appeal."  Id. at 972 n.12.

In Gotti, there was no motion for judgment of acquittal based on insufficiency of the evidence in his first trial.  Indeed, the jury had not convicted Gotti on any of the charges against him.  Gotti, 451 F.3d at 135.  Instead, it acquitted him on one charge and divided on others, resulting in the declaration of a mistrial on those charges.  Id.  The district court then denied Gotti's post-trial motion to bar a retrial on two of the counts on double jeopardy grounds.  Id. at 135-36.  Gotti then sought interlocutory review of that double jeopardy ruling itself.  Id. at 136.  There was no appeal by the government of any trial court ruling and no cross-appeal by Gotti trying to challenge a trial court ruling on a motion for judgment of acquittal.  Citing Abney, the Court of Appeals analogized the trial court's double jeopardy ruling to a court's denial of a pretrial motion to dismiss counts of an indictment on double jeopardy grounds and concluded that this ruling met the requirements of the collateral order doctrine.  Id. In addressing the merits of Gotti's double jeopardy argument, it rejected that argument on very different grounds than those Carpenter raises in asking us to hear his cross-appeal.[11]  Id. at

---

[11] Gotti argued that because the jury could not unanimously agree that the government had proved two predicate racketeering acts with which he was charged, he was entitled to acquittal on the RICO charges against him and could not be retried on any of the charges.  The court rejected Gotti's "extraordinary argument,"

136-37. Moreover, as noted, the "merits" issue on appeal in <u>Gotti</u> was the trial court's double jeopardy ruling itself. Here the "merits" issue in the cross-appeal is the trial court's ruling on the sufficiency of the evidence. <u>Gotti</u> has scant relevance to our application of the collateral order doctrine to that sufficiency ruling.

To the extent that Carpenter makes a judicial efficiency argument that is independent of the collateral order doctrine, we reject that argument as well. Carpenter's primary efficiency argument – that granting appellate jurisdiction over the cross-appeal makes "practical sense" because "given the government's appeal, the Court will now conduct a thorough review of the trial record in this case" – is beside the point. We are not at liberty to go beyond the established criteria of the collateral order doctrine to create new exceptions to the finality requirements of § 1291. Indeed, Carpenter's argument that we should consider his sufficiency claim as we consider the government's appeal runs directly counter to the first criterion of the collateral order doctrine, which requires that the collateral issue (here, sufficiency) be "conceptually distinct" from the issues in the underlying action. <u>Kouri-Perez</u>, 187 F.3d at 5. Of course,

---

noting that "[o]n this reasoning, juror disagreement as to the proof of a predicate act could <u>never</u> result in a hung jury," and that "[t]he government is permitted to retry a defendant following a mistrial resulting from a hung jury." 451 F.3d at 136-37.

Carpenter's sufficiency arguments are deeply entwined with the merits of the mail and wire fraud charges that constitute the underlying action.

In addition, even if we could recognize such an efficiency exception, any efficiency gains promised by Carpenter are illusory because there is little comparability between the review that we have had to conduct in our deferential review of the new trial grant and the de novo review we would have to conduct to evaluate the sufficiency of the evidence. In his sufficiency challenge, Carpenter raises arguments of causation, intent, constructive amendment of the indictment, reliance upon a theory of liability based on omission, good faith as an absolute defense, and venue. We have not had to address any of those issues in order to evaluate the district court's new trial ruling.

Carpenter raises a second argument under the banner of efficiency. If we deny appellate jurisdiction over his cross-appeal, he says, and reverse the district court's grant of a new trial, we will have to conduct a second review of the trial record at a later point in time after Carpenter is sentenced and files a direct appeal. Thus, Carpenter contends, granting jurisdiction to hear the cross-appeal at this point will "conserve judicial resources." However, the subsequent direct review of the issues now raised in the cross-appeal would not represent a "second review" of the trial record because, as we have already noted, our

review of the new trial ruling has not required us to review the portions of the record relevant to the issues raised in the cross-appeal. More importantly, Carpenter's second efficiency argument betrays his frontal challenge to the most basic precepts of the final judgment rule. If we were to reverse the trial court's new trial ruling, there would be no final judgment until Carpenter had been sentenced after a remand. See Berman v. United States, 302 U.S. 211, 212 (1937) ("Final judgment in a criminal case means sentence. The sentence is the judgment."); United States v. Leichter, 160 F.3d 33, 35 (1st Cir. 1998). We are not at liberty to disregard such well-established final judgment rules in pursuit of a false efficiency.

## III.

For the reasons described above, we affirm the district court's grant of a new trial. We dismiss the cross-appeal for lack of jurisdiction.

**So Ordered.**

_____ - **Concurring and Dissenting Opinions Follow -**

**LYNCH**, <u>Circuit Judge</u>, **concurring.** A trial judge may grant a new trial only "if the interest of justice so requires." Fed. R. Crim. P. 33(a). The power is used sparingly. But it may be triggered by a myriad of circumstances. Rule 33 wisely does not attempt to characterize those circumstances so as to limit a trial judge's authority to rule on a timely motion for a new trial.

Here, the trial judge concluded that the jury may well have been diverted from its task of determining whether the government had proven beyond a reasonable doubt each of the elements of the charged offenses. <u>United States</u> v. <u>Carpenter</u>, 405 F. Supp. 2d 85, 102 (D. Mass. 2005). The judge found that the government's case was not so strong that it could confidently be said that the repeated gambling references had no illegitimate effect on the verdict. <u>Id.</u> at 103. The court held that because it was possible that the government's closing arguments tainted the jury's verdict, the verdict could not be allowed to stand. In that context, the district court called the government's closing arguments "improper." <u>Id.</u>

The trial judge implicitly ruled that defendant had sufficiently preserved his objection to the gambling metaphor so that he was not required to take the unusual step of interrupting the government's closing argument. An appellate court is not entitled to second guess that conclusion, which was certainly not an abuse of discretion. The trial judge recognized that there was

a point at which the relevance of the large losses produced by risky trading was outweighed by the danger of distracting the jury from focused consideration of the actual charges. That grey zone was never well defined throughout the trial, and its demarcation points were not clarified before the closing arguments, despite the granting of a continuing objection. Perhaps both sides should have sought clarification before the closing arguments.

In my view, the real issue is not whether one side acted "improperly." It is the potential effect of this situation on the jury which matters. The experienced trial judge, who sat through the trial and the closing, concluded that the balance had tipped too far within that grey zone and that the interest of justice required a new trial.

Given that the trial judge lacked confidence that the verdict was based on proper considerations, and given the context in which the trial judge ruled, an appellate judge cannot say that the trial judge's conclusion was unreasonable. Indeed, the decision to grant a new trial does not even approach being an abuse of discretion.

**CAMPBELL**, <u>**Senior Circuit Judge**</u>, **dissenting**.  This appeal centers around two issues:  (1) whether in ruling upon defendant's motion for a new trial, the district court had to apply the plain error standard in Fed. R. Crim. P. 52(b)--a question turning on whether defendant failed to lodge a timely objection within Fed. R. Crim. P. 51(b)[12] sufficient to preserve the error for which the new trial was granted, namely, the government's use of gambling metaphors in its closing, which the court felt may have induced a verdict based on the jury's moral disapproval of gambling; and (2) whether the U.S. Attorney's gambling rhetoric went so far as to exceed fair comment and, in the event plain error review was required, to meet that standard.

In answer to (1), I believe the district court was required to apply the plain error standard in ruling on the new trial motion.  As for issue (2), it would be premature for us to pass judgment on whether the gambling rhetoric could be found to amount to plain error, that question being one for the district court in the first instance.  I would vacate and remand while

---

[12]Fed. R. Crim. P. 51(b) provides,

A party may preserve a claim of error by informing the court--when the court ruling or order is made or sought-- of the action the party wishes the court to take, or the party's objection to the court's action and the grounds for that objection.  If a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party.  A ruling or order that admits or excludes evidence is governed by Federal Rule of Evidence 103.

-37-

retaining jurisdiction so as to be able to decide in the future--should plain error be found below--whether that finding exceeds the district court's considerable discretion in the matter.

1.   Adequacy of Objection

Judicial review is limited to "the notably ungenerous plain error standard" whenever "a defendant defaults on [the] obligation [to protect his own interests] by failing to make a contemporaneous objection to questionable comments in the prosecution's closing argument." United States v. Taylor, 54 F.3d 967, 977 (1st Cir. 1995).  Nothing in the language of Fed. R. Crim. P. 51 and 52, or in binding precedent, suggests that some different rule applies where a district court, as here, (rather than a court of appeals) is asked, post-verdict, to grant a new trial based on an alleged inappropriate closing.

One of the principal purposes of the contemporaneous objection requirement is to alert the district judge so that she or he can take on-the-spot curative steps, by instructing the jury to disregard the prejudicial rhetoric or in some other way minimizing the harm, thus obviating the trouble and expense of a new trial. As this court stated in Taylor, 54 F.3d at 972,

> [C]alling a looming error to the trial court's attention
> affords an opportunity to correct the problem before
> irreparable harm occurs.  Then, too, the raise-or-waive
> rule . . . precludes a party from making a tactical

decision to refrain from objecting, and subsequently, should the case turn sour, assigning error . . . .[13]

Here, there is simply no indication that the gambling metaphors used by the government in its closing, and the purported moral disapproval they might engender in jurors, were concerns ever contemporaneously called to the district court's attention, either during the closing when those references were actually being made or, right after, before the case went to the jury, when the district judge could still have taken steps to cure whatever prejudice the rhetorical metaphors may have caused in the minds of the jurors. The basis for the grant of a new trial was not the brokers' testimony, to admission of which earlier, unsuccessful, objections were lodged and on which earlier objections the majority now relies in its opinion, but the colorful gambling metaphors employed by the government in closing argument which were later said by the district court to have carried the risk of inflaming the jurors' moral disapproval.

---

[13]In a later civil case, this court has said,

We have made it transparently clear that the raise-or-waive rule can neither be ignored nor brushed aside as a "pettifogging technicality or a trap for the indolent." Nat'l Ass'n of Soc. Workers v. Harwood, 69 F.3d 622, 627 (1st Cir. 1995). Rather, it is a prudential rule "founded upon important considerations of fairness, judicial economy, and practical wisdom." Id.

Muniz v. Rovira, 373 F.3d 1, 4 (2004).

Had defendant contemporaneously objected to this allegedly inflammatory rhetoric either during or after the closing, before the case went to the jury, the court could have instructed the jury to disregard it and explained to the jurors why the analogies were prejudicial and overblown, thus obviating the extreme and costly remedy of a new trial. Even had the defense attorney hesitated to interrupt the government's argument, there was ample time afterwards to have lodged an objection and for the court to have taken corrective steps. Indeed, following the court's closing jury instructions, when counsel were invited to submit their objections to the charge, defense counsel took that opportunity to protest certain parts of the government's closing but never mentioned these supposedly outrageous misstatements. Nor did the judge say anything to counsel or the jury about them during or after the closing, as one might have expected had the earlier evidentiary objections relied on by my colleagues actually functioned so as to call to the judge's mind that the defense was now objecting to the closing's gambling rhetoric[14]--or even that the

[14]Judge Lipez states that the court's earlier response, "You're covered under Rule 103," to Carpenter's request for a running objection to admission of the Merrill Lynch brokers' testimony (described by defense counsel as portraying Carpenter as "an aggressive speculator[,] river boat gambler") was a clear recognition by the court of a continuing objection that served later as an adequate objection under Rule 51(b) to the government's repeated rhetorical use, in its closing, of the gambling analogies. But Rule 103 of the Federal Rules of Evidence is an evidentiary rule. See Rule 51(b) ("A ruling or order that admits or excludes evidence is governed by Federal Rule of Evidence 103").

rhetoric violated the court's own earlier cautionary admonition against overemphasizing certain matters. The court's silence on the subject at the crucial moments strongly suggests that whatever the earlier objections accomplished, they did not accomplish what Rule 51(b) seeks--namely to alert the court contemporaneously, when corrective action by the court still remains possible, that the defense is then and there objecting to certain language being used in the government's oratory.

The purpose of Rule 51(b), in other words, is to put the court on _actual_, not just constructive, notice that a party protests a particular alleged defect--here, the closing gambling rhetoric--so that, inter alia, appropriate corrective action can be taken immediately if warranted. Rule 51(b) is not well served by resting the finding of an adequate objection upon an elaborate chain of appellate inferences going back to non-contemporaneous objections made earlier for a different purpose. Rule 51(b) requires, and ordinarily receives, a practical interpretation,

---

Appropriately, the objections in question all related to the court's admission in evidence of the brokers' testimony, which emphasized the risky nature of option trading but did not invoke repetitive gambling metaphors nor raise the question of whether analogizing defendant's conduct to gambling would captivate the disapproval of jurors based on their moral disapproval of gambling. A new trial was not granted because the court decided it had erred in admitting the brokers' testimony but because of the inflammatory nature of the gambling figure used in the closing, with its peculiar tendency to invoke moral disapprobation.

-41-

consistent with its purpose to alert the court in a meaningful way so that it can act before too late.

It is overwhelmingly evident from the record that no one, prior to the verdict, got the message, including the judge, that the defense was protesting the government's rhetorical gambling analogies--analogies which the district court later said may have elicited the jurors' moral disapproval based upon their distaste for gambling. Without having been contemporaneously alerted by a Rule 51(b) objection, the district court was obliged, when it ruled on defendant's post-verdict motion for a new trial, to employ plain error review under Rule 52(b). The government made this point when arguing the motion,[15] but the district court did not address it at all. As my colleagues agree, it now seems the court, in granting a new trial, used the ordinary review standard (although Carpenter argues otherwise in his appellate brief).

My colleagues contend we should leave it to the district court, in these circumstances, whether a sufficient objection was lodged to preserve the closing gambling metaphor issue. Here, the judge, in passing on the defendants' new trial motion, made no

---

[15]Judge Lipez, in the majority opinion, speaks of "looking in vain" for any indication that the government ever argued that objection to the closing's gambling metaphors had not been preserved. In fact, the government noted (under the heading that its "closing and rebuttal fell within the bounds of proper argument") that most of Carpenter's points had not been preserved, and listed the few that had been, making clear its belief that the defense's objection to the use of gambling metaphors was one that had not been preserved and was subject to plain error review.

express finding that an objection had been made, nor did he rule at all on the government's contention that an objection had not been preserved by the defense on the use of the gambling metaphors during the closing. But my colleagues would infer from the district court's complete silence that it must have found a sufficient defense objection, and they say they must defer to the district court on that and all related matters.

My difficulty with the above is that it treats the raise-or-waive rule as if it were only of concern to the district court--to protect it, for instance, against being "sandbagged" in the common situation where a defendant appeals to this court from an adverse ruling of the trial judge concerning some matter never called to the court's attention below. My colleagues' viewpoint would hold that where the district judge is satisfied--as presumably he was here--with whatever steps defendant took, or did not take, to preserve an objection, that should end the matter.

But I believe such deference is extreme. The raise-or-waive rule, it is true, exists to protect the trial judge, but it also serves other important goals. As already discussed, it serves the purpose of judicial economy, forcing all concerned, including the court itself, to face issues--such as the challenged rhetoric used by the government here--at a time when corrective action can still be taken short of a costly new trial. The opportunity for correction afforded by a timely objection, as well as the penalty

of plain error review for failure to object, also promote essential fairness to the other party, here the government--and not only to the government alone, but to those who must bear the burdens of a new trial, such as the victims of defendant's alleged misconduct and other witnesses.  Had there been a meaningful, contemporaneous objection here, the government would likely not have to retry the case, saving both monetary costs and the added burdens on many others.

This is not to question the district court's discretion, were there merely a question of disputed evidence over the making of a sufficient contemporaneous objection, to resolve that dispute. But, here, the only arguably pertinent objections in the record--those made earlier under Fed. R. Evid. 103 to the admission of certain testimony--fell flagrantly short of meeting the requirements of Fed. R. Crim. P. 51(b) for valid objections to the closing's gambling rhetoric.  And the record contains nothing except silence to suggest that the district court, when granting a new trial, ever determined that an adequate objection--or any objection--had been made.  Rules 51 and 52 are binding procedural rules to which courts must adhere.  The wide discretion very properly given to the trial judge does not include the discretion to ignore or simply bypass the raise-or-waive rule.[16]

---

[16]Of course, one might imagine special circumstances where a defense objection might not be needed to preserve an issue.  For instance, the judge might, when the offending conduct occurs, give

I would add that even the plain error standard of Rule 52(b) still allows a court, in appropriate circumstances, when faced with a strong sense that an injustice has or may have occurred, to allow a new trial even though a timely objection was not lodged--and our review of such a decision would and should take into account the trial judge's firsthand "feel" for a case tried in his presence. Nevertheless, plain error review remains a considerably tougher, higher, standard than ordinary review. Given defendant's default, the government was entitled to the reassurance that the latter standard was being applied in this case, since the question of whether or not the gambling rhetoric used went too far, and its likely unfair impact on jurors, is a close one as to which the standard of review used could well have a decisive effect on whether or not to grant a new trial.

2. Whether Gambling Rhetoric Was Excessive

voice, sua sponte, on the record, to his own objection, which might in some circumstances relieve the defense of the need to object separately. But it seems unwarranted to presume such a special exception here, given the judge's complete silence at and after the closing, especially as, when the gambling rhetoric was later called to the judge's attention, he granted the extraordinary relief of a new trial. Surely, one would suppose, if the judge had at all considered the questionable character of the rhetoric at the time it was delivered, or then had believed the defense had objected to it at some earlier time, he would not have remained silent in the face of such knowledge, allowing events to proceed and the jury to remain uninstructed as to the improprieties that had occurred. To infer on this record and in the face of judicial silence, the preserving of a sufficient objection, seems to me tantamount to saying that Rule 51(b) and its companion, 52(b), need not be observed by the trial judge unless he or she cares to do so.

As said, I believe that this appeal should be remanded to the district court with instructions to reconsider its new trial ruling under the correct plain error standard. A ruling by us at this juncture would be premature, since the district court's judgment based on its first-hand knowledge and feel is an essential prelude to whatever action this court takes. We would necessarily grant considerable deference to whatever view the district court takes on whether what occurred at the trial met the high standard of plain error. This does not mean there are no limits to our deference, nor that appellate review will thereafter be forbidden. A district court would not have carte blanche discretion to order a new trial simply because, to take a purely hypothetical example, it deemed the U.S. Attorney's closing remarks to be too eloquent and defense counsel's closing much less so--even if the trial court believed the difference had been decisive to the case's outcome. There are, moreover, some arguments an attorney may make which will be so entirely relevant as to be privileged as a matter of law, just as there are others which the district court may determine dispositively as going too far.

Here, the government argues that its gambling analogy was so apt that it fell within the safety zone and that, in any event, the analogy was not so extreme as to amount to plain error. This is not an easy issue, and it is one as to which the district court's ruling, along with its reasons, one way or another, will

not only be helpful but essential.  I would, therefore, remand for a new ruling on the new trial motion, one explicitly based on the plain error standard, which, in these circumstances, the district court was, in my view, legally obliged by the Federal Rules of Criminal Procedure to apply.  It is most unlikely the district court believed it was applying that standard when it ruled previously, and, given especially the closeness of the grounds for granting a new trial, I believe the government is entitled to a ruling expressly based upon the correct legal standard.  Given the high hurdle of plain error review, a remand is no mere waste of judicial time.  To the contrary, it could be critical to the outcome, and it is also a necessary act of fairness to the government and those persons and interests the government serves, given the defendant's failure to have preserved a proper objection.