# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2156

_____

United States of America,

Appellee,

v.

Marcus Q. Davis,

Appellant.

_____

No. 07-2158

_____

United States of America,

Appellee,

v.

Stephen L. Edwards,

Appellant.

Appeals from the United States
District Court for the
Southern District of Iowa.

_____

Submitted: January 16, 2008
Filed: July 25, 2008

_____

Before WOLLMAN, BRIGHT, and SMITH, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Marcus Davis and Stephen Edwards were convicted of one count of malicious use of fire causing personal injury and death in violation of 18 U.S.C. § 844(i). On appeal, Davis and Edwards argue that there was insufficient evidence to support the verdict and that the district court[1] made several errors concerning the use of out-of-court statements admitted into evidence during the trial. We affirm.

I. Background

On March 6, 2000, a fire began at 845 Cross Park Avenue, a twelve-unit apartment complex in Iowa City, Iowa. Kurtis and Laura Miller were residents of the building. As a result of the fire, Laura suffered serious burns; Kurtis died as a result of soot and smoke inhalation and thermal injuries. After determining that the fire had been set intentionally by pouring gasoline in front of apartment 3C, law enforcement officials investigated the circumstances surrounding the fire for more than five years. Davis and Edwards were indicted in September 2005. Their motions to sever the trial were denied, and a joint trial began on June 26, 2006.

Because we are reviewing the record for the sufficiency of the evidence, we state the evidence presented at trial in the light most favorable to the jury verdict. Davis lived in the apartment building directly behind the building where the fire was set. Edwards was a frequent guest in Davis's apartment. The resident of apartment 3C, Jan Ballew, had engaged in an on-going dispute with Davis regarding the volume level of Davis's music. Initially, Ballew complained about the noise from Davis's apartment to her property manager, who advised her that she needed to call the police, which Ballew did numerous times in 1999. Thereafter, Ballew spoke with Davis's wife, and the two agreed that Ballew should let the Davises know when the music was

---

[1]The Honorable Ronald E. Longstaff, United States District Judge for the Southern District of Iowa.

too loud rather than call the police. Ballew attempted to comply with this agreement, making no calls to the police during the winter of 1999-2000, and personally visiting Davis's apartment when the music was too loud. During these visits, Davis responded to Ballew's complaints with profanity. Ballew decided that she would no longer inform Davis or his wife that the noise was too loud and would instead call the police. Ballew informed Davis's wife of this decision.

On March 4, 2000, at 11:12 p.m., Ballew called the police to report that the music coming from Davis's apartment was too loud. The police responded by visiting Davis's apartment. On that same evening, or on a similar occasion when the police were leaving after responding to a noise complaint, Davis's mother-in-law, Caroline Bennett, arrived at the apartment and asked Davis what had happened. Davis appeared angry and said, "Mama, she always calling the police on me. I'm going to get her."

On March 6, 2000, Ballew made another complaint to the police regarding the noise from Davis's apartment. Ballew asked the police to visit her apartment to assess the noise level before they visited Davis's apartment. Two officers arrived at Ballew's apartment at approximately 9:10 p.m., and after agreeing that the music was too loud, they visited Davis's apartment. The officers informed Theophilus Davis, Marcus Davis's cousin, that they had received a noise complaint. Theophilus pointed to Ballew's apartment and said, "was it her?" The officers did not disclose the identity of the complainant, but told Theophilus to keep the music down and issued a warning for violating the noise ordinance. The officers left at approximately 9:22 p.m. Marcus Davis later stated that he "shut the music off in [the officer's] face." Davis asked his mother-in-law to take his wife to her house for the night. Davis's mother-in-law did not know why Davis made this request, as he had never made such a request in the past, and she did not comply.

After Ballew had gone to bed, she heard a loud bang at her front door. She went to investigate and realized there was a fire. She went out to her deck and tried to shut the door to the deck, but was unable to because of the heat. She saw Davis on the ground below her apartment, and he asked, "What's happenin'?" Ballew said, "What's it look like?" Davis responded, "You have to learn to get along with people." Thereafter, Ballew was rescued by firefighters. Ballew later identified Davis as the person below her apartment, and she described his statement as a threat.

At approximately 9:45 p.m., the two officers who had responded to Ballew's noise complaint received a dispatch call regarding the fire. They returned to the apartment building at approximately 9:50 p.m. One of the officers entered the building and began pounding on the apartment doors on the first floor. Upon exiting the opposite side of the building, the officer nearly kicked the door into Davis, who appeared to be entering the building and was wearing an Iowa Hawkeyes shirt. Davis entered the building, but was told to leave by the other officer who was inside. Davis ignored the officer and attempted to grab his flashlight. As the officer pulled the flashlight away, Davis said, "I'm still going up there," and ran up the stairs. The officer followed, but the two were not able to stay long because of their difficulty in breathing.

Thereafter, Davis returned to his rear patio and continued barbecuing. Later, while still wearing the Iowa Hawkeyes shirt, Davis initiated contact with one of the officers who had responded to the noise complaint and was at the scene of the fire. Davis stated that, "that lady needs to learn to get along with people." Davis also said that his father was a firefighter and that he (Davis) could have saved people in the building if he had had a wet rag over his mouth. Edwards was also on the patio during this conversation.

On another occasion that evening, Davis was back at the scene of the fire and made contact with another officer. When asked by the officer for identification, Davis

responded that he did not have any but that his name was Jared Q. Davis and that he lived in Chicago. Davis gave his correct birth date and the location where he could later be found. Davis admitted that he told Ballew that she needed to learn to get along with people better. He also commented that every time he had a barbecue, Ballew called the police. Thereafter, Davis went back toward his apartment. Davis later admitted that he had provided the officer with a false first name, but claimed that he had done so because of an outstanding traffic warrant in Illinois.

Additional law enforcement arrived to investigate the fire. One of the officers was assigned to interview witnesses and to speak with Jared Davis. He went to Davis's apartment and talked with Davis's wife, who told him that she did not know anyone by the name of Jared Davis and that no one in the apartment had been near the fire. The officer saw a man in the living room, sitting on the couch and wearing a white shirt and blue pants. The officer returned to the apartment a short time later, after having spoken with other officers familiar with the residents of Davis's apartment. When Davis's wife answered the door, the officer observed that there was a different man sitting on the couch in the living room, so he asked where the first man had gone. Davis's wife initially denied that there had been another man, but then claimed that he had left. The officer indicated that law enforcement had been watching the apartment and had not observed anyone leaving. At that point, Davis came downstairs and was recognized by the officer as the person he had first seen sitting on the couch even though Davis was now wearing different clothes. Davis said that he was not Jared Davis and that he did not know anyone by that name. Davis and his wife gave their consent to allow the officers to look around the apartment. The officers found Edwards upstairs but could not locate Jared Davis.

Later that evening, two officers independently identified Davis as Jared Davis. Nevertheless, Davis denied that he was Jared and denied that he had spoken with the officers earlier that evening. Even after the officers obtained Davis's identification and noted that his middle initial, last name, and date of birth were the same as the

-5-

information given by the so-called Jared Davis, Davis continued to deny that he had previously identified himself as Jared. Thereafter, Davis agreed to come to the police station, where he believed that he would be fingerprinted, and admitted that he had falsely identified himself as Jared Davis. In an interview a few hours later, Davis also admitted that he was at his apartment when the police first arrived looking for Jared Davis and that he had changed his clothes. The officers told Davis that they believed he changed his clothes so that the officers at the scene of the fire would not recognize him, to which Davis responded, "That's exactly why I did that."

During police questioning, Davis continued to complain about Ballew and how she had repeatedly called the police on him. Davis referred to her as "Aunt Hagatha" and said that she was miserable and wanted everyone else to be miserable. Davis was informed of the seriousness of the fire given the death of Kurtis Miller. Davis commented that Miller's death was a homicide, but he denied involvement in the fire.

During an interview with law enforcement, Edwards told a detective that he was at Davis's apartment when the police responded to the noise disturbance call. Edwards claimed that he was not present when the fire began because he had gone to a gas station with D'Wana Porter. After the interview, Edwards called Porter and told her that detectives would be talking with her. Porter indicated that she had already been visited by detectives and that she had told them she was not with Edwards before the fire. At that point, Edwards terminated the conversation. Later that day, Edwards called Holly Skretta and told her, "If anyone asks, I was with you." When Skretta asked for clarification, Edwards said, "Last night, if anyone asks, I was with you." Skretta complied with Edwards's request and falsely told investigators that she was with Edwards at the time of the fire, when in fact she was at work. After being interviewed, Skretta received a call from Edwards. Edwards was wondering what the police wanted to know and Skretta told him what she told the police. Skretta eventually told officers that Edwards was not with her at the time of the fire. When Edwards found out about this, he was upset with her and warned her that if anyone

asked any more questions she should shut her mouth. Skretta testified that Edwards grabbed her arm during this conversation, which frightened her.

During a subsequent interview with law enforcement, Edwards claimed to be unable to remember what he did on the day of the fire because he had had a lot to drink and was "fucked up." He said that on the day of the fire he had been at Skretta's house, Porter's house, and Ava Henderson's house. He reiterated that he had left Davis's apartment right after the police arrived regarding the noise complaint and that he had gone to the gas station with Porter. He related how many packs and what brand of cigarettes he had purchased. Initially, Edwards said that he did not see any fire trucks until he returned from the gas station. Later, Edwards said that he saw two fire trucks when he left Davis's apartment. When questioned about this discrepancy, Edwards admitted that he was present during the entirety of the fire and that he had observed the fire. This version of the facts matched the information from a gas station receipt indicating that cigarettes were purchased at 10:27 p.m., more than forty minutes after the fire began. Edwards also indicated that the noise complaint likely came from the lady next door because she complained about that a lot. In later interviews, when officers told Edwards about the seriousness of the fire, Edwards responded, "Yeah, I know someone died in the fire, but I didn't do it." He further stated, "We don't give a fuck. All we give a fuck about is kickin' it." Edwards later admitted that he knew what had happened with the fire but that he wasn't going to tell law enforcement because it was their job to figure it out.

In late 2002 and early 2003, Edwards was living with his girlfriend, Betty Jo Thompson. Thompson had heard rumors about Edwards's involvement in the fire and asked him about it. Though Thompson could not remember Edwards's exact words, she testified that one evening during their relationship Edwards admitted that he was involved in the fire and that, "we started the fire." She also testified that Edwards stated, "It wasn't to hurt anybody, to murder anybody. It wasn't to kill anybody. It was to get someone to come out of the house."

Two years after the fire, Donte Lindsey contacted the police with information regarding the fire. He stated that a couple of days before the fire he was visiting Davis's apartment when the police arrived in response to a noise violation. After the police left, he overheard Davis and Edwards talking about the complaint and indicating that "they would handle it." Lindsey also stated that on the evening of the fire he returned to Davis's apartment building from the gas station down the block. As it was getting dark outside, he saw Davis exit the front door of Ballew's apartment building and walk around to the back of the building, toward his own apartment. Edwards met up with Davis, and they both walked toward Davis's apartment. Shortly thereafter, Lindsey saw smoke coming out of Ballew's apartment building.

During a police interview in February of 2006, Donna Bell stated that on the night of the fire she was inside Davis's apartment when she heard sirens outside and heard the front door open. Davis and Edwards entered the kitchen and Davis changed his clothes. Bell asked, "What the hell did you do?" Davis and Edwards did not respond.

Donna Bell and Merriam Knight are Joyce O'Neal's daughters. O'Neal was present during Donna's interview in February 2006, and she (O'Neal) told the police that two days after the fire she went to Davis's apartment with Merriam. O'Neal, who had known Davis for only a few weeks or months, asked Davis how he was doing, to which Davis responded, "Not so good, Mom. I didn't mean for it – I didn't mean for it to happen like this. I was only trying to scare the old lady because every time our music – we would turn our music up, she would always call the police on us."

Both defendants filed a motion in limine to prevent the government from using statements attributed to one defendant against the nondeclarant codefendant. The district court stated that it "anticipates that the government will elicit testimony carefully to ensure that statements made by one defendant do not reference the non-declarant, co-defendant." The district court permitted defense counsel to object to the

admission of statements attributed to one of the defendants and allowed defense counsel to make the strategic choice whether they wanted to object at every opportunity or to object the first time a statement was admitted in the course of each witnesses's testimony. Defense counsel chose to object once per witness and to have the limiting instruction repeated at that time.

During the government's rebuttal closing argument, the prosecutor stated, "ladies and gentlemen, they even confessed to it." The prosecutor then displayed a demonstrative aid, which he referred to as "Exhibit K," even though it had not been admitted as a trial exhibit,[2] and had not been published to defense counsel as required by the local rules. The aid consisted of a power point slide that showed side-by-side statements attributed to each of the defendants. On the left was the statement attributed to Davis by O'Neal: "Not good mom. I didn't mean for it to happen like this. I was only trying to scare the old lady because every time we played our music she called the police." On the right side was the statement attributed to Edwards by Thompson: "It wasn't meant to hurt anybody, to murder anybody. It wasn't to kill anybody. It was to get someone to come out of the house." After discussing each of the statements, the prosecutor concluded his argument by stating, "The government has proven beyond a reasonable doubt that Marcus Davis set a gasoline fire on the third floor of 845 Cross Park to scare the old lady. And Stephen Edwards was right there helping him. 'It wasn't meant to kill anybody.' And look how similar their statements are." Neither defendant objected to these statements.

Edwards and Davis made motions for judgment of acquittal and motions for a mistrial based upon the prosecutor's use of "Exhibit K." On the first day of deliberations, the jury informed the court that it was deadlocked. The following day, the jury returned a verdict convicting both defendants. Thereafter, both of the

---

[2]After the trial, the government filed the demonstrative aid as Exhibit 90.

defendants filed a motion for a new trial. The district court denied the defense motions and the defendants were subsequently sentenced to 360 months in prison.

## II. Sufficiency of the Evidence

Davis and Edwards argue that their convictions are not supported by sufficient evidence and that the district court erred in denying their motions for judgment of acquittal and their motions for a new trial.

### A. Motion for Judgment of Acquittal

We review *de novo* the district court's denial of a motion for judgment of acquittal. United States v. Sturdivant, 513 F.3d 795, 800 (8th Cir. 2008). "Viewing the evidence most favorably to the government, resolving evidentiary conflicts in the government's favor, and accepting all reasonable inferences from the evidence supporting the jury's verdict, this court affirms if the evidence at trial is sufficient to sustain a conviction." Id. In reviewing a motion for judgment of acquittal, we must defer to the jury's determination of witness credibility. Id.

Davis and Edwards argue that the evidence presented at trial equally supports innocence and guilt and therefore is insufficient to uphold the jury verdict. See United States v. Davis, 103 F.3d 660, 667 (8th Cir. 1996) ("[W]here the government's evidence is equally strong to infer innocence as to infer guilt, the verdict must be one of not guilty and the court has a duty to direct an acquittal." (alternation in original) (internal quotation omitted)). We do not agree.

Davis contends that his presence at the scene of the fire is not incriminating because he lived nearby and that his comment that Ballew needed to learn to get along with people was understandable because Ballew had spoken to him in a nasty manner. Davis also contends that his false identification of himself as "Jared Davis" should be

excused because he provided the false name because of an outstanding warrant and did provide his correct middle initial, last name, and date of birth. Davis further argues that he should be given credit for attempting to rescue people from the fire. Edwards contends that he was merely a guest at Davis's apartment at the time of the fire, that he had no motive to start the fire, and that his incriminating statements indicated that he felt bad that someone had been hurt in the fire.

Although Davis and Edwards have provided alternative explanations for some of the incriminating evidence presented at trial, we must accept all inferences in favor of the government. See Sturdivant, 513 F.3d at 800. The evidence indicated that Davis harbored animosity toward Ballew, he was in the proximity of the fire when it started, and he tried to conceal his identity by providing false information to law enforcement and by changing his clothes several times during the course of the evening. There was also evidence that Davis made incriminating statements regarding his involvement in the fire. The fact that Davis voluntarily spoke with law enforcement and that he attempted to rescue people from the fire does not negate the incriminating evidence against him. The evidence regarding Edwards indicated that he was in the vicinity of the fire when it was started, that he tried to arrange a false alibi, that he did not cooperate with law enforcement even though he said that he knew what happened with the fire, and that he made incriminating statements regarding his involvement in the fire. In light of the totality of the circumstances, we conclude that the evidence does not equally support innocence and guilt and that it is sufficient to support the jury's verdict. See Davis, 103 F.3d at 667 (to determine the strength of the evidence, we look at the totality of the circumstances).

B. Motion for New Trial

We review the district court's denial of a motion for new trial for abuse of discretion. Sturdivant, 513 F.3d at 802. "A district court abuses its discretion if it fails to consider a factor that should have been given significant weight, considers and

gives significant weight to an improper or irrelevant factor, or commits a clear error of judgment in considering and weighing only proper factors." United States v. Bertling, 510 F.3d 804, 807 (8th Cir. 2007) (internal quotation omitted). A motion for a new trial based upon the weight of the evidence is disfavored, and a new trial should not be granted simply because we would have reached a different verdict. Id. at 808. Nevertheless, "[t]he court may grant a new trial motion where it finds that the verdict is contrary to the weight of the evidence . . . where the evidence presented weighs heavily enough against the verdict that the court believes a miscarriage of justice may have occurred." United States v. Smart, 501 F.3d 862, 865 (8th Cir. 2007) (second alteration in original) (internal quotations omitted). In making this determination, the district court may weigh the evidence and evaluate the credibility of the witnesses, but the "authority to grant a new trial should be exercised sparingly and with caution." Sturdivant, 513 F.3d at 802 (internal quotation omitted).

Davis and Edwards were convicted of violating 18 U.S.C. § 844(i), which states:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both . . . ; and if death results to any person, . . . shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment.

The defendants argue that the district court abused its discretion in denying their motion for a new trial because there was insufficient evidence that they were responsible for starting the fire. Specifically, they assert that the government did not have any physical evidence linking them to the scene of the crime and that the government's witnesses faced serious credibility problems. They note that O'Neal did not come forward until February 2006, when she was present during her daughter

-12-

Donna's interview with the police, and that Donna, who was having financial problems at the time, asked about a reward for providing information about the fire. They attack Betty Jo Thompson's credibility by pointing out that she had had a brief romantic relationship with Edwards almost two years after the fire and became upset when she found out he was seeing other women. The defendants also assert that these statements were not true confessions because they were not made directly to the police and were not sworn statements. Additionally, Donte Lindsey, the only witness that placed Davis and Edwards at the scene of the fire, admitted that he had been drinking and smoking marijuana the night of the fire and contacted the police with information about the fire only after he was charged with a crime and seeking a deal. His testimony also contained inconsistencies, such as his claim that he saw the defendants standing near a pool before it was dark outside, when in fact no pool exists in the vicinity where he placed the defendants, and the fact that the fire did not start until after dark.

The fact that the government's case is based upon circumstantial evidence does not by itself necessitate a new trial. United States v. Jiminez-Perez, 238 F.3d 970, 974 (8th Cir. 2001). And although the statements attributed to the defendants were not sworn confessions given to law enforcement, the cumulative affect of the evidence presented at trial was that each statement was corroborated by other evidence. See United States v. Crenshaw, 359 F.3d 977, 987-91 (8th Cir. 2004) (discussing the value of witness testimony where there are inconsistencies or credibility issues). Accordingly, the defendants' ability to point to the government's witnesses' credibility problems does not establish that the evidence is so lacking in probative force that a new trial is warranted. See United States v. Fazio, 487 F.3d 646, 656 (8th Cir. 2007) ("There was evidence to support the verdict. It may or may not have been the same verdict we would have rendered had we sat on the jury. However, what the district court, or appellate court, thinks of a defendant's guilt or innocence is of little import if there is sufficient evidence to support the jury's guilty verdict. The jury

watched and heard each witness testify, viewed the documentary evidence, and came to a conclusion about who and what to believe.").

The defendants also argue that the district court erroneously disregarded the credibility problems presented by the government's witnesses because it applied the stricter standard used for a motion for judgment of acquittal when analyzing the motion for new trial. In its order on that motion, however, the district court properly stated the applicable legal standards and noted that it was not required to view all the evidence in the light most favorable to the verdict and that it could weigh the evidence and judge the credibility of the witnesses. The district court noted that the government had presented evidence that pointed to the defendants' guilt. Specifically, the district court noted that the evidence presented placed both defendants at the scene of the fire and established that they had a motive to set the fire. The district court also acknowledged that the government's evidence was circumstantial and that some of the government's witnesses had credibility problems. Nevertheless, the district court concluded that the defendants had had the opportunity to address these issues during the trial and that they received a fair trial. See United States v. Watkins, 486 F.3d 458, 464-65 (8th Cir. 2007) (opinion vacated and subsequently reinstated in relevant part) (declining to second-guess a district court's credibility determination when witness testimony is corroborated and defense counsel cross-examined government's witnesses and had opportunity to expose unreliability of witnesses or impeach witnesses with prior convictions). Because we believe that the record contains sufficient evidence to support the convictions and that no miscarriage of justice occurred, we conclude that the district court did not abuse its discretion by denying the motions for a new trial.

III. Government's Closing Argument

The defendants assert that their convictions should be reversed because the prosecutor's conduct and statements during closing argument were improper and

-14-

should have led to a mistrial. We review for an abuse of discretion the district court's decision to deny a motion for mistrial. United States v. Brandon, 521 F.3d 1019, 1026 (8th Cir. 2008).

As indicated earlier, the statements at issue occurred at the end of the government's rebuttal closing argument. In sum, the prosecutor stated that Davis and Edwards had confessed to the crime, displayed "Exhibit K" on a large screen directly comparing statements attributed to each defendant, and drew the jury's attention to the similarity of the statements. The defendants assert that this violated Bruton v. United States, 391 U.S. 123 (1968), violated the district court's motion in limine, violated the district court's local rules, and illustrated the district court's error in not granting their motions to sever the trial.

A. Prosecutorial Misconduct

Prosecutorial misconduct can result in the reversal of a conviction if (1) the prosecutor's conduct or remarks were improper, and (2) the conduct or remarks prejudicially affected the defendant's substantial rights by depriving the defendant of a fair trial. United States v. Eagle, 515 F.3d 794, 804 (8th Cir. 2008). Closing arguments must be limited to the evidence and the inferences that can reasonably be drawn from the evidence. Id. at 805. District courts have broad discretion to control closing arguments. United States v. Littrell, 439 F.3d 875, 881 (8th Cir. 2006). We will reverse a conviction based upon improper statements in closing arguments only if there is a clear abuse of discretion. Id. If the defendant does not object to an allegedly improper statement, however, the alleged error is not properly preserved for appellate review, with the result that we review only for plain error and reverse only under exceptional circumstances. Id. at 881-82; see also United States v. Crawford, 523 F.3d 858, 861 n.3 (8th Cir. 2008) (applying plain error standard when the defendant did not object to the statements he alleges constitute prosecutorial misconduct); United States v. Mickelson, 378 F.3d 810, 819 (8th Cir. 2004) (applying

plain error standard to the defendant's challenge of statements admitted into evidence because the defendant did not object to the statements when they were admitted). We reverse for plain error only if "(1) the court committed an error; (2) the error is clear under current law; and (3) the error affects [the defendant's] substantial rights." Mickelson, 378 F.3d at 819 (alteration in original) (internal quotation omitted). "However, even if there has been plain error affecting the defendant's substantial rights, whether we notice the error is a matter of discretion, and we reverse for plain error only where the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id.

The defendants argue that the district court granted them a standing objection that applied to the prosecutor's closing argument. The standing objection, however, applied only to the admission of out-of-court statements that were admissible against one of the defendants but inadmissible against the other defendant. The proper objection during the closing argument would have been for misuse of the evidence and not to its admission. In the absence of any objection during the argument, the alleged error was not properly preserved for appeal. Accordingly, our review is for plain error only.

The defendants assert that the use of their out-of-court statements during the prosecutor's closing argument violated Bruton because it invited the jury to use statements made by one defendant against the other. In Bruton, the Supreme Court held that the admission of a non-testifying defendant's statement implicating a codefendant violates the codefendant's constitutional right to confront the witnesses against him even if there is a curative instruction otherwise. 391 U.S. 123, 135-36 (discussing the Sixth Amendment's Confrontation Clause). There is no Bruton violation, however, if the statement "only inculpates a codefendant inferentially-through linkage to other evidence." United States v. Coleman, 349 F.3d 1077, 1085 (8th Cir. 2003) (citing Richardson v. Marsh, 481 U.S. 200, 208 (1987)). Thus, a Bruton violation can be avoided by redacting information from the statement that

references the codefendant and providing a limiting instruction to the jury. Coleman, 349 F.3d at 1085; see also United States v. Edwards, 159 F.3d 1117, 1125-26 (8th Cir. 1998) (allowing proper names to be replaced with pronouns or nondescriptive nouns to avoid Bruton violation).

In United States v. Jones, we explained that, even when the confession by a defendant does not specifically name the codefendant, a Bruton violation occurs "when the unnamed defendant is tied directly to the confession in the manner and context in which the confession is presented." 101 F.3d 1263, 1270 n.5 (8th Cir. 1996). Thus, in Jones, the statement of one defendant in which the defendant referred to a group of people committing the crime did not violate Bruton because the prosecutor carefully applied the statement only to the declarant. Id. at 1270 n.4. In contrast, we held in United States v. Long, that a Bruton violation had occurred because, during the testimony in which the statement was admitted into evidence, the prosecutor invited speculation and "led the jury straight to the conclusion that 'someone' referred to [the declarant's codefendant]." 900 F.2d 1270, 1280 (8th Cir. 1990) (affirming the conviction however, because the Bruton violation was harmless).

Here, the prosecutor compared a statement attributed to each of the defendants. Neither of the statements, however, referred to the other defendant or any other person directly. Thus, the admission of the statements was not an obvious error under Richardson and its progeny. See Richardson, 481 U.S. at 211 ("[T]he Confrontation clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.").

In any event, we conclude that the prosecutor's use of the demonstrative aid did not affect the defendants' substantial rights, nor did it deprive them of a fair trial. To determine whether a defendant received a fair trial, we look at (1) the cumulative effect of the misconduct, (2) the strength of the properly admitted evidence of the

defendant's guilt, and (3) the curative actions, if any, taken by the district court. Eagle, 515 F.3d at 804-05. In conducting this analysis, we note that because there was no contemporaneous objection to the prosecutor's conduct, we will reverse only under exceptional circumstances. Littrell, 439 F.3d at 881-82.

Before any evidence was presented, the district court informed the jury that the opening statements and closing arguments are intended to help the jury understand the evidence but are not themselves evidence. See Eagle, 515 F.3d at 806. The statements attributed to the defendants in the government's closing argument were properly admitted, and the jury received several limiting instructions regarding the use of out-of-court statements. The district court also repeated its limiting instruction during the jury's final instructions, which the jury heard immediately before closing arguments, and it was included in the packet of instructions given to the jury. Finally, we note that the defendants' failure to object left the district court in a quandary, for as it noted in its analysis of the motion for mistrial:

> [w]hen I saw the statements side by side, it gave me some pause, but at that point I don't think it was my place to interject myself into the closing argument and try to deal with the concern I saw it raise. Had defense counsel at that point raised the concern, it would have given me the ability to do something about it at that point and at least lessen whatever effect there may have been . . . I guess my concern is that with the quality of representation both defendants had in this case, that problem was immediately visible and known by defense counsel, and it was their choice not to raise it to give the Court an opportunity at that point to deal with it. Now, I'm not being critical. I'm just saying . . . I had some concern, but I did not think it was my place to raise it on my own. . . . I'm just trying to say that that's a tactical decision. I'm not criticizing it. I'm just saying that it took away my ability to deal with it.

Accordingly, although we do not condone the manner in which the prosecutor utilized the previously undisclosed demonstrative aid, we conclude that the district court did not abuse its discretion in denying the defendants' motions for mistrial.[3]

B. Motion to Sever

The defendants argue that the district court abused its discretion in denying their motions to sever and that they suffered real prejudice as a result. Specifically, the defendants argue that the prosecutor's closing argument made it impossible for the jury to compartmentalize the evidence that related to each defendant.

Two or more defendants may be charged in the same indictment if they allegedly participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. Fed. R. Crim. P. 8(b). A district court may sever the defendants' trials, however, if joinder of the defendants appears to prejudice a defendant or the government. Fed. R. Crim. P. 14. A defendant seeking severance must show that "real prejudice" will result from a joint trial. United States v. Mickelson, 378 F.3d 810, 817-18 (8th Cir. 2004). Merely showing that the defendant would have a better chance for acquittal with a separate trial is not enough. Id. To show real prejudice, the defendant must establish that "(a) his defense is irreconcilable with that of his co-defendant or (b) the jury will be unable to compartmentalize the evidence as it relates to the separate defendants." Id. at 818. Generally, the risk that a joint trial will prejudice one or more of the defendants "is best cured by careful and thorough jury instructions." Id.; see also Zafiro v. United States, 506 U.S. 534, 537 (1993) (approving of joint trials because they promote efficiency and avoid the injustice of inconsistent verdicts). We reverse a district

---

[3]In light of this conclusion, we need not address the defendants' contentions that the demonstrative aid was not published to them before closing arguments, in violation of Local Rule 83.6(j), and that the prosecutor inaccurately described the aid as an exhibit even though it had not been admitted into evidence.

-19-

court's denial of a motion to sever only if the district court abused its discretion and the defendant suffered real prejudice. <u>Mickelson</u>, 378 F.3d at 817.

Davis and Edwards were charged with participating in the same act of arson and therefore were properly joined under Rule 8(b). In the pretrial motion and in the motion for mistrial, the defendants' main argument for severance was that some of the evidence admissible against one of the defendants was damaging to both defendants. This is not enough to require separate trials. <u>See</u> <u>id.</u> at 818 ("Severance is not required merely because evidence that is admissible only against some defendants may be damaging to others."). Because we have already concluded that the government presented sufficient evidence to uphold the convictions and that the defendants' substantial rights were not affected by the prosecutor's closing argument, we conclude that the defendants have not established that they suffered real prejudice from the denial of their motion to sever.

The judgment is affirmed.

BRIGHT, Circuit Judge, dissenting.

I respectfully dissent.

This case presents a clear <u>Bruton</u> error which was preserved and was most certainly not harmless. Indeed, the error here was so egregious and prejudicial it amounted to plain error. I would therefore reverse the convictions.

After a joint trial, Marcus Davis and Stephen Edwards were convicted of one count of malicious use of fire resulting in death in violation of 18 U.S.C. § 844(i). They were each sentenced to 360 months' imprisonment. Their convictions stem from a fire that erupted on March 6, 2000. One person tragically died in the fire.

-20-

Police determined the fire had been set intentionally. However, charges were not brought against Davis and Edwards for another five years.

The Government's case consisted almost entirely of circumstantial evidence with the exception of two incriminating statements, one made by Davis, and the other made by Edwards. Two days after the fire, Davis allegedly said to Joyce O'Neal, "I didn't mean for it – I didn't mean for it to happen like this. I was only trying to scare the old lady because every time our music – we would turn our music up, she would always call the police on us." This alleged statement to O'Neal was not made to law enforcement personnel until 2006.

In late 2002 or early 2003, Edwards reportedly said to Betty Jo Thompson, "We set the fire to get someone out." Edwards also stated, "It wasn't to hurt anybody, to murder anybody. It wasn't to kill anybody. It was to get someone to come out of the house." Because the majority of the Government's evidence against Davis and Edwards was circumstantial, these statements were key to its case.

Both Davis and Edwards filed pre-trial motions to exclude Edwards's statements to Betty Jo Thompson. The district court denied the motions, but stated in response that it would give the jury the following limiting instruction:

> You may consider the statement of defendant, whoever it is, Edwards or Davis, only in the case against him and not against the other defendant. You may not consider or discuss that statement in any way when you are deciding if the Government has proved beyond a reasonable doubt this case against the other defendant.

The parties and the court also agreed that instead of objecting every time a statement was referenced during a witness's testimony, defense counsel would need to object once – the first time the statement was referenced with each witness. At that point,

a standing objection would be established with respect to that witness. In addition to the standing objection, the district court also obtained assurance from the prosecutor that the Government would "sanitize" any admissions or out-of-court statements so as to eliminate any improper and prejudicial reference to Davis or Edwards.

Notwithstanding the clear instruction from the district court, the Government at the very end of its rebuttal argument displayed, as a demonstrative aid, Davis's and Edwards's statements side-by-side on one Power Point slide.[4] The prosecutor remarked, "And, ladies and gentlemen, they even confessed to it." The slide remained on display before the jury until the end of the argument. The prosecutor closed his rebuttal by stating, "And look how similar their statements are."[5]

Neither Davis nor Edwards made any specific objection to this slide presentation during the prosecutor's rebuttal. After closing arguments, the court issued its jury instructions which included the limiting instruction on the use of the confessions. Immediately after the case had been submitted to the jury, Davis and Edwards moved for a mistrial on the ground that the prosecutor's use of the statements during rebuttal violated their Sixth Amendment rights.

The district court denied the motion. However, the court noted, "When I saw the statements side by side, it gave me some pause, but at that point I don't think it was my place to interject myself into the closing argument and try to deal with the concern I saw it raise." The district court explained that it could not issue a curative instruction and rebuke the prosecutor because the defendants failed to make a contemporaneous objection.

---

[4]The slide was not admitted into evidence at trial.

[5]A paper copy of the slide is attached as an appendix to this dissent.

The majority holds that the prosecutor's use of the defendants' statements in its rebuttal did not violate Bruton and that regardless, the error was not preserved and did not amount to plain error. I disagree.

I begin first with the Bruton violation. In Bruton v. United States, 391 U.S. 123 (1968), the Supreme Court held that the admission of a nontestifying codefendant's confession, which expressly implicated the defendant, presented a great risk that the jury could not or would not follow the court's limiting instructions and therefore violated the defendant's Sixth Amendment rights under the Confrontation Clause. Id. at 137. The Court explained that "[n]ot only are [such incriminating statements] devastating to the defendant but their credibility is inevitably suspect." Id. at 136. Thus, the Court held that the conduct of the prosecutor violated the defendant's Sixth Amendment right "to be confronted with the witnesses against him," U.S. Const. amend. VI. Bruton, 391 U.S. at 137.

In Richardson v. Marsh, 481 U.S. 200 (1987), the Supreme Court revisited its holding in Bruton and addressed whether a statement, redacted to omit any reference to the defendant, violates Bruton when the defendant is linked to the confession by properly admitted evidence. Id. at 202. Clarifying that Bruton's holding is a narrow one, Richardson explained that Bruton does not apply to statements that only become incriminating when linked with evidence introduced later at trial. Id. at 208. Thus, the Court held, "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." Id. at 211.

While Richardson held that Bruton's application does not extend to a statement that in no way implicates or even references the defendant, the Supreme Court explained in Gray v. Maryland, 523 U.S 185 (1998), that Bruton is not confined to a statement that expressly names a defendant. Id. at 196. In Gray, the Supreme Court

-23-

held that the admission of a nontestifying codefendant's confession, which replaced the defendant's name with "blank," violated the Sixth Amendment. Id. In so holding, the Court explained that a statement is not outside Bruton's scope if the jury must use inference to connect the statement in the confession to the defendant. Id. at 195. The Court explained that what implicates Bruton is "the *kind* of, not the simple *fact* of, inference." Id. at 196. And therefore, despite the fact that the statement in Gray did not reference the defendant's name or identity, the statement was protected under Bruton because it led the jury straight to the conclusion that the blanks in the codefendant's statement referred to the defendant. Id. at 196, 197.

Thus, under Bruton and its progeny, the key inquiries when a Bruton question is raised are: (1) whether the nontestifying codefendant's statement implicates the defendant; and (2) "whether [under the circumstances] a court's instruction to apply a confession only to the declarant is adequate to constrain the jury to do so," United States v. Jones, 101 F.3d 1263, 1270 (8th Cir. 1996). In determining whether a statement implicates a defendant, we look to the *manner and context* in which the prosecutor presented the statement. See id. at 1270 n.5.

In this case, both statements, as presented in the prosecutor's rebuttal, clearly implicated both Davis and Edwards by linking each defendant's alleged admission to the other codefendant. The prosecutor drew attention to the statements by prominently displaying them side-by-side during the rebuttal. And with the statements in full view, the prosecutor concluded by stating, "And Stephen Edwards was right there helping him. 'It wasn't meant to kill anybody.' And look how similar their statements are." By presenting the statements in this manner during rebuttal, the prosecutor graphically connected the statements, the effect of which was that Edwards's statement implicated Davis and Davis's statement implicated Edwards.

Next, the prosecutor's use of the statements during rebuttal effectively nullified the district court's limiting instructions. We explained in Jones that limiting

instructions are rendered ineffective when the statements, as used by the prosecutor, will lead the jury to "easily" and "logically" apply the codefendant's confession to the defendant, notwithstanding the court's limiting instruction. See Jones, 101 F.3d at 1270 (explaining that in determining whether the court's limiting instruction is ineffective, the inquiry is whether, "if left without instruction the jury might easily and logically apply the confession to the defendant"). The prosecutor in this case eliminated the curative effect of the court's limiting instruction by suggesting that the jury use Davis's statement against Edwards and Edwards's statement against Davis. Indeed, the prosecutor instructed the jury to compare the two statements in evaluating whether Davis and Edwards were guilty of the charges against them. The use of the out-of-court confessions in such manner violated Davis's and Edwards's rights under the Confrontation Clause.[6]

Of course, a Bruton violation alone is not enough to compel reversal as Bruton violations are subject to harmless error review. United States v. Coleman, 349 F.3d 1077, 1085 (8th Cir. 2003). The test for determining whether a constitutional error is harmless is "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Neder v. United States, 527 U.S. 1, 15 (1999) (internal quotations and citation omitted). In light of the circumstantial nature

---

[6]The district court recognized that the prosecutor's conduct during rebuttal posed a serious risk that the jury would use the statements in violation of Davis's and Edwards's constitutional rights. In its order denying Davis and Edwards a new trial, the district court made the following remarks regarding the prosecutor's use of the statements during rebuttal:

> [T]he Court finds that the prosecutor's conduct was questionable. Displaying [the statements side-by-side] and asking the jury to "look how similar their statements are," *invited the jury to improperly consider the statements of one co-defendant in determining the guilt of another.* The Court repeatedly instructed the jury that such comparisons were not permissible and the prosecutor's rebuttal argument violated those instructions and the Court's ruling on the motions in limine.

of the case against Davis and Edwards, and that the prosecutor's comments came as the jury was about to begin deliberations, by the time the prosecutor concluded his rebuttal it was too late for a limiting instruction to have any curative effect. The damage had been done. Under these circumstances, the error was not harmless.

The majority has a fallback position, however. It concludes that even if there was error, it was not preserved because defense counsel failed to object during the prosecutor's rebuttal. I disagree. Counsel did, in fact, preserve the error.

While it is true that defense counsel remained silent during the prosecutor's rebuttal, the defendants' rights had been preserved earlier in the trial proceedings. Both Davis and Edwards filed motions in limine prior to trial seeking to exclude Edwards's statements to Betty Jo Thompson.[7] The motion in limine not only objected to the use of any statements at trial but also to the use of any statements in "arguments."

Here the district court made a definitive ruling denying the motions in limine. Under Federal Rule of Evidence 103(a) ("Rule 103(a)"), the court's ruling made it unnecessary for defense counsel to raise another objection during rebuttal to preserve the error. Rule 103(a) provides in pertinent part: "Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party *need not renew* an objection or offer of proof to preserve a claim of error for appeal."

_____

[7]Edwards did not, however, move in limine to exclude the statement Davis made to Joyce O'Neal. However, the issue of the Government's use of Davis's and Edwards's out-of-court confessions during trial and arguments was certainly before the district court. Both Davis and Edwards raised this issue in their motions for severance. Furthermore, after the district court denied severance, counsel for both Davis and Edwards expressed concerns regarding the out-of-court statements.

-26-

Fed. R. Evid. 103(a) (emphasis added). Thus, Davis and Edwards were not *required* to renew the objection during the rebuttal in order to preserve the error for review.[8]

Relying on Rule 103, the First Circuit held, under somewhat similar circumstances, that an error was preserved for appeal despite defense counsel's failure to object to the use of certain gambling metaphors in the prosecutor's closing arguments. United States v. Carpenter, 494 F.3d 13, 20-21 (1st Cir. 2007). In Carpenter, the defendant, Carpenter, moved in limine and made several trial objections to the introduction of certain testimony relating to the defendant's investments and losses. Id. at 18. The district court, on several occasions, ruled on the objections and noted that for purposes of Rule 103 the objection was preserved for appeal. Id. at 19-20.

The First Circuit held that the error was preserved under Rule 103(a) because the court made a *definitive ruling* on the objection and that Rule 103(a) did not require defense counsel to object during closing arguments to preserve the error for appeal. Id. at 20-21. In so holding, the First Circuit looked to the accompanying commentary to Rule 103 which states, "[w]hen the ruling is definitive, a renewed objection or offer of proof at the time the evidence is to be offered is *more a formalism than a necessity*." Id. at 18-19 (quoting Advisory Committee notes to the 2000 Amendment to Rule 103) (emphasis added).

Similarly, here the district court made a definitive ruling on the motions in limine. Indeed, the district court noted that defense counsel had a standing objection dispensing with the requirement that counsel object every time Davis's or Edwards's out-of-court statements were improperly referenced. Therefore, the error was preserved.

---

[8]From a strategic standpoint, an objection during the prosecutor's rebuttal may have only compounded the problem by drawing further attention to the statements. Indeed, securing an evidentiary ruling in advance of trial eliminates this risk.

The conduct of the prosecutor here produced a <u>Bruton</u> error, which seriously affected the fairness, integrity, and public reputation of the judicial proceedings. And so, even if counsel failed to preserve the error, it was plain and requires reversal of the convictions. The majority states that the error was "not an obvious error under <u>Richardson</u> and its progeny."[9] Slip Op. at 17. I fail to see how the record supports that conclusion. <u>Richardson</u> and its progeny, as discussed in this dissent, prohibit the use of each codefendant's out-of-court confession in the manner in which they were used in this trial. Not only was there a substantial risk that the jury would use Davis's and Edwards's confessions against the other, but the prosecutor encouraged the jury to do so. In this context, the district court's limiting instruction became entirely ineffective.

As in <u>Bruton</u>, we are presented here with a situation where "the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are *deliberately* spread before the jury in a joint trial." <u>Bruton</u>, 391 U.S. at 135-36 (emphasis added).

For these reasons I would reverse the convictions. The error here was preserved and was far from harmless, indeed it was plain. In a weak case, this improper blow carried the day.

---

[9]The implication of the majority's statement is unclear. The "obviousness" of the error is irrelevant. Either the prosecutor's conduct did or did not violate <u>Bruton</u>.

Joyce O'Neal –
statement by Davis

"Not good mom. I didn't mean for it to happen like this. I was only trying to scare the old lady because every time we played our music she called the police".

DEFENDANT'S
EXHIBIT
A

- Betty Jo Thompson – statement by Edwards

"It wasn't meant to hurt anybody, to murder anybody. It wasn't to kill anybody. It was to get someone to come out of the house."

29

-29-